UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CURTIS GENE COPELAND, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-395 |
| | § | |
| RONALD FERRELL, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER DISMISSING CERTAIN CLAIMS, RETAINING CASE, AND DENYING MOTION FOR PRELIMINARY INJUNCTION AND MOTIONS FOR TRANSFER

This civil rights action was filed by a state prisoner pursuant to 42 U.S.C. § 1983.

Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996), any

prisoner action brought under federal law must be dismissed if the complaint is frivolous,

malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief

from a defendant immune from such relief.  *See* 42 U.S.C. § 1997e(c); 28 U.S.C.

§§ 1915(e)(2), 1915A.  Plaintiff's action is subject to screening regardless whether he

prepays the entire filing fee or proceeds as a pauper.  *Ruiz v. United States*, 160 F.3d 273,

274 (5th Cir. 1998) (per curiam); *Martin v. Scott*, 156 F.3d 578, 580 (5th Cir. 1998) (per

curiam).  Plaintiff's *pro se* complaint must be read indulgently, *Haines v. Kerner*, 404

U.S. 519, 520 (1972), and his allegations must be accepted as true, unless they are clearly

irrational or wholly incredible, *Denton v. Hernandez*, 504 U.S. 25, 33 (1992).

Applying these standards, Plaintiff's Eighth Amendment claims against Defendants Captain Juan Salazar and Medical Practice Manager Drew Stalinsky are **RETAINED**, and service shall be ordered on these Defendants in their individual capacities.  Plaintiff's motion for a preliminary injunction and/or temporary restraining order (D.E. 20) is **DENIED** without prejudice.  Plaintiff's Motion for Transfer to a Different Facility (D.E. 9) and Emergency Motion for Transfer (D.E. 10) are **DENIED** without prejudice. Plaintiff's claims against Defendants Sue Alexander and James Hurtzclaw are **DISMISSED** without prejudice on Plaintiff's oral motion.   Plaintiff's remaining claims against the remaining defendants are **DISMISSED** for failure to state a claim and/or as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b)(1).

## I.    Jurisdiction.

The Court has federal question jurisdiction over this civil rights action pursuant to 28 U.S.C. § 1331.  Upon consent of the Plaintiff (D.E. 19), this case was referred to the undersigned United States Magistrate Judge to conduct all further proceedings, including entry of final judgment.  (D.E. 22).   *See* 28 U.S.C. § 636(c).

## II.    Procedural background and Plaintiff's allegations.

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID), and is currently confined at the McConnell Unit in Beeville, Texas.  He filed his original complaint on December 9, 2013, alleging that certain McConnell Unit officers and officials were violating his Eighth Amendment right to be free from cruel and unusual punishment by, inter alia, failing to protect him from potential assaults by other inmates, denying him a soft, blended diet and/or dentures, and

denying him appropriate mental health treatment and/or hormone replacement therapy. (See D.E. 1, 6, 7). He named the following nineteen individuals as Defendants: (1) Dr. Ronald Ferrell, DDS;* (2) Major James A. McGee; (3) Major Michael Alsobrook; (4) Sergeant Benjamin Ramirez; (5) Lieutenant Sequeo Salinas; (6) Lieutenant Joshua B. Boyer; (7) Major Evelyn Castro;* (8) Lieutenant Bernadette M. Rodriguez; (9) Captain Juan Salazar, food services;* (10) Asst. Warden Matt Barber;* (11) Assistant Warden Carol E. Monroe, Jr.;* (12) Warden Gary L. Currie; (13) Drew Stalinsky, Medical Practice Manager; (14) Sergeant Brandon S. Belote; (15) Sergeant Consuelo Benavidez; (16) Lieutenant James D. Shiver, Jr.; (17) Sue Alexander, psychotherapist; (18) James Hultzclaw, psychotherapist; and (19) Erick Echavary, Physician's Assistant (PA).[1]

On December 13, 2013, Plaintiff filed two supplements to his complaint. (See D.E. 6, 7).

On December 18, 2013, Plaintiff filed a letter-emergency motion requesting a transfer to another TDCJ facility. (D.E. 9, 10).

On January 13, 2014, a Spears[2] hearing was conducted. The following allegations were made in Plaintiff's original complaint (D.E. 1), supplements to complaint (D.E. 6, 7), emergency motions (D.E. 9, 10), Plaintiff's "statement" (D.E. 18), or at the hearing:

---

[1] Plaintiff previously sued the defendants designated with an asterisk alleging deliberate indifference to his serious medical needs in *Copeland v. Ferrell, et al.,* Case No. 2:13-cv-100. However, on June 19, 2013, plaintiff filed a motion to voluntarily dismiss that case, alleging that he was assigned to administrative segregation and prison officials were failing to bring him the necessary legal supplies to prosecute his claims. *Id.,* D.E. 24. The case was dismissed without prejudice on June 21, 2013. *Id.*, D.E. 27.

[2] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985); *see also Eason v. Holt,* 73 F.3d 600, 603 (5th Cir. 1996) (stating that testimony given at a *Spears* hearing is incorporated into the pleadings).

### A.    Safety, housing and classification issues.

In 2010, while in the free world, Plaintiff was assaulted, and he lost a large number of teeth.  He has only seven (7) teeth remaining, located on the lower jaw, center to right.  More recently, sometime in 2013, Plaintiff was diagnosed with Klinefelter syndrome, a genetic condition that adversely affects testosterone production.  Plaintiff also suffers from a gender identity disorder.

On November 18, 2011, Plaintiff reentered the TDCJ via the Garza West Transfer Facility.  He immediately notified prison officials and the Attorney General that he needed increased protection, in part due to his slightly feminine affect, and also because one of his underlying convictions was for indecency with a child.  He was placed in Administrative Segregation (Ad. Seg.), and approximately two weeks later, he met with Sergeant Gonzales of the Safe Prisons Program (SPP).  Sergeant Gonzales indicated he would recommend protective custody.  However, at his Unit Classification Committee (UCC) hearing held the next day, Plaintiff was denied protective custody and was assigned to General Population (GP); however, he was told to request protective custody when he arrived at his unit of assignment.

On January 11, 2012, Plaintiff arrived at the McConnell Unit. He immediately requested protective custody, but Major Castro suggested that he "give GP a try" before seeking protective custody.  However, within a week, Plaintiff's cell-mate would not let him in his cell except to sleep at night.  Plaintiff's cell-mate was involved in contraband smuggling, and he threatened Plaintiff that if a cell search was called, Plaintiff would be blamed.  Plaintiff sent an I-60 seeking help, and he met with Sergeant Mayer of the Safe

Prisons Program.  Sergeant Mayer recommended protective custody for Plaintiff, but the UCC denied it.  Plaintiff then filed a Life in Danger (LID) claim, and in response, Major Adam Gonzales instigated an Offender Protection Investigation (OPI).  Major Gonzales told Plaintiff that he would request protective custody from the State Classification Committee (SCC); however, after reviewing Major Castro's reasons denying protective custody, Major Gonzales changed his mind and did not contact the SCC.

Plaintiff then filed another LID, which Major Castro denied at a UCC the next week, telling Plaintiff that his IQ was too high and his body size too big to warrant protective custody.  Plaintiff filed a grievance.  He also made a rope and filed a grievance in different hand writing to alert officials that he was going to attempt to escape. Sergeant Benjamin Ramirez searched Plaintiff's cell but could not find the rope.  Plaintiff was then placed in Administrative Segregation with certain gang members who tried to pressure Plaintiff to join the Aryan Brotherhood.  Because he refused, these offenders investigated Plaintiff's past and learned of his 2003 conviction for indecency with a child, which they then broadcasted to other offenders. Plaintiff began receiving threats, and he filed numerous LIDs one after another, but they were all denied.

On June 19, 2012, Major Adam Gonzales told Plaintiff that he was going to move him, but he did not.  In response, Plaintiff "set fires [and] gave officers weapons trying to get moved."

On June 23, 2012, Plaintiff met with Lieutenant Sequeo Salinas about his LID claims and stated that he "would hate to hurt an officer" to get moved.  Major Castro

ordered Lieutenant Salinas to write Plaintiff a disciplinary case for threatening an officer. *Id.*

On August 1, 2012, a gang member ordered Plaintiff to hide a handcuff key during a cell search.  Plaintiff told Lieutenant Bernadette Rodriguez where the key was hidden, and, although he was removed from that living area, he was given a major disciplinary case.[3]

Plaintiff continued to receive threats based on the nature of his convictions and his feminine appearance.  He filed numerous LIDs and OPIs were conducted, but at his UCC hearings, he was told he was in the safest place he could be.

In June/July 2013, Plaintiff's 82 year-old grandmother was threatened on Facebook because of Plaintiff's convictions.  Plaintiff told officials and gave them a copy of the letter from his grandmother, but they did not investigate it.

On October 2, 2013, Plaintiff received a major disciplinary case for hanging a towel for privacy, but it should have been characterized as a minor case.  Plaintiff was moved to Administrative Segregation F-pod which is known to house many members of the Aryan Brotherhood.

On F-pod, an aggressive offender named Ivy began harassing Plaintiff in November 2013.  Offender Ivy called Plaintiff a "child molester," and tried to let another offender into Plaintiff's cell.  Plaintiff told Lieutenant Shiver and Sergeant Belote that Offender Ivy had weapons, but they did nothing.  At a November 2013 UCC hearing

---

[3] Lieutenant Rodriguez apologized to plaintiff but said she had to follow orders and give him a disciplinary case.

before Major McKee, Major Alsobrook and Ms. Gonzales, Plaintiff complained about Offender Ivy; however, the UCC panel denied his transfer request and told him there was no safer place then Administrative Segregation at the McConnell Unit.

On November 21, 2013, Plaintiff went to recreation and an inmate threw hot coffee at him and yelled "child molester;" Officers Molina and Torres did nothing. Later that day, Officer Torres searched Offender Ivy's cell but failed to find a secreted spear. Offender Ivy twice shot the spear at Plaintiff, the second time missing his head only by a few inches. Plaintiff broke the spear and told Officer Torres, "this is what you missed" during the search, and he then flushed the tip down the toilet. Plaintiff filed an LID and Lieutenant Boyer conducted an OPI. Lieutenant Boyer reviewed the security tapes but could not find any evidence of a spear being shot at Plaintiff. Plaintiff has written to Warden Currie and to the Attorney General about the constant threats to his life, but has received no response.

On December 18, 2013, Plaintiff filed his emergency motion asking to be transferred off the McConnell Unit, again complaining of the November 2013 attempted assaults by Offender Ivy to hurt him and the lack of response by prison officials. (D.E. 10).

**B.    Medical issues.**

At medical screening when Plaintiff reentered the TDCJ, it was noted that he had "nerve damages" in his jaw from the 2010 assault and that he was missing all but seven teeth. When he arrived at the McConnell Unit, Plaintiff was seen by the dentist, defendant Dr. Ferrell, and he agreed that Plaintiff needed dentures. Dr. Ferrell submitted

a denture request, but it was denied by prison officials in Huntsville.  Plaintiff asked Dr. Ferrell if he would extract his remaining seven teeth, stating that it caused him pain to chew on only one-side.  Dr. Ferrell refused to extract the teeth, but instead recommended that Plaintiff receive a "blended diet."  Dr. Ferrell then referred Plaintiff to Dr. Whitt, the McConnell Unit medical provider, who had the authority to order a special diet.

Dr. Whitt examined Plaintiff and ordered that he receive a "mechanical soft diet." Despite Dr. Whitt's order, Captain Salazar and the kitchen staff rarely prepared a special tray for Plaintiff, and when they did, he received it late and the food was cold.  After trying for several months to obtain the soft diet, Plaintiff gave up on his efforts and accepted a regular meal tray.

Beginning in October 2013, Plaintiff submitted sick call requests to be seen by a dental professional to again request a special diet due to the pain caused by chewing food. However, due to staff shortages, he was not escorted to medical or dental appointments until he filed suit.  In December 2013,[4] Plaintiff was seen by the dental assistant, but the assistant told Plaintiff he needed to talk to the warden and/or medical regarding dentures or a special diet.

On October 17, 2013, Plaintiff was seen at Hospital Galveston for back pain.  The Galveston doctors prescribed Plaintiff muscle relaxants for spasms due to osteoporosis and degenerative spine disease.  On October 29, 2013, Plaintiff arrived back at the

---

[4] Plaintiff related that Dr. Ferrell refused to treat him because Plaintiff sued him in Case No. 2:13-cv-100.

McConnell Unit where he should have been seen by medical immediately for follow-up care; however, he was not seen in medical until December 4, 2013.

At the December 4, 2013 appointment, Plaintiff was seen by PA Echavary for follow-up care of issues with his back, ear and foot. PA Echavary denied Plaintiff additional muscle relaxants stating such medication could be prescribed for only 7 days every three months, and he limited Plaintiff's pain medication to 600 mg of Ibuprofen twice a day. PA Echavary examined Plaintiff's ear and foot, but he refused to look at Plaintiff's chapped skin or discuss his gender identity issues.

Plaintiff named as defendants his two mental health care providers, Sue Alexander and James Hultzclaw, claiming they failed to diagnose his Klinefelter Syndrome and refused to send him to the Jester IV Unit for further psychiatric evaluation. However, at the *Spears* hearing, Plaintiff related that he was scheduled to be seen at Jester IV, and that hormone therapy would be addressed, and he orally moved to dismiss defendants Alexander and Hultzclaw.

On February 13, 2014, Plaintiff filed a pleading entitled "motion to inform the Court," that was docketed as a motion for a preliminary injunction. (D.E. 20). In this pleading, Plaintiff relates that he did go to Jester IV for evaluation and treatment of his Klinefelter syndrome and gender identity disorder, but that the experience "was a complete failure" because he received little time with a therapist and was not seen by a medical team. *Id.* at 1. Plaintiff was sent back to the McConnell Unit where he complained to Sue Alexander about the Jester IV treatment. *Id.* Ms. Alexander related

that she would try to send Plaintiff back to Jester IV for additional evaluation in a few weeks.[5]  *Id.*

Plaintiff also relates that, upon his return to the McConnell Unit, he was assigned to Administrative Segregation, specifically 12-building, C-pod, 2-cell.   However, Plaintiff refused this housing because the cell was next to Offender Cooper, an inmate Plaintiff had filed an LID about in September 2013.  (D.E. 20, p. 2).  Plaintiff was "left in a cage in the hallway" for 8 hours without anything to drink or access to a restroom, and consequently, he urinated on the floor.  *Id.*  Thereafter, he was housed in a cell that had not been cleaned after the last inmate with just a bare mattress and trash everywhere.  *Id.*  Two days later, he received sheets, but he does not have a blanket and he is cold.  *Id.*  Plaintiff claims that Defendants are retaliating against him for filing this lawsuit.  *Id.*

Through this lawsuit, Plaintiff is seeking:

(1)    An immediate transfer off the McConnell Unit and housing in protective custody:

(2)    Dentures and all other appropriate medical care;

(3)    Compensatory damages for the pain and suffering associated with his jaw; and

(4)    Damages for his mental pain and suffering caused by living in fear.

---

[5] Plaintiff states that he is filing a grievance regarding the lack of treatment he received at the Jester IV Unit.  Plaintiff is advised that, to the extent he seeks to pursue claims related to events and persons at the Jester IV Unit, those claims are not properly before this Court.  Plaintiff admits that he has not yet exhausted those claims, and additionally, venue would not be proper, nor would the Court have personal jurisdiction over individuals located in Fort Bend County. *See* 28 U.S.C. § 1391(b).

### III.    Section 1983.

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988).  A defendant acts under color of state law if he misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya,* 291 F.3d 859, 861 (5th Cir. 2002).

"Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir. 1983).  There is no vicarious or *respondeat superior* liability of supervisors under section 1983.  *Thompkins v. Belt,* 828 F.2d 298, 303-04 (5th Cir. 1987).  *See also Carnaby v. City of Houston,* 636 F.3d 183, 189 (5th Cir. 2011) (the acts of subordinates do not trigger individual § 1983 liability for supervisory officials).  For a supervisor to be liable under § 1983, the plaintiff must show that (1) the supervisor failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the constitutional violation; and (3) the failure to train or supervise amounts to deliberate indifference to the plaintiff's constitutional rights. *Roberts v. City of Shreveport,* 397 F.3d 287, 292 (5th Cir. 2005). Establishing a supervisor's deliberate indifference generally requires a plaintiff to demonstrate "at least a pattern of similar violations."  *Rios v. City of Del Rio, Tex.,* 444 F.3d 417, 427 (5th Cir. 2006) (citations omitted).

## IV.   Discussion.

Plaintiff is suing defendants in their official and individual capacities for monetary damages as well as injunctive and declaratory relief.

### A.      Eleventh Amendment immunity.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state…."  Const. Amend. XI.  This withdrawal of jurisdiction effectively confers an immunity from suit.  *P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy,* 506 U.S. 139, 144 (1993).  As such, the Supreme Court has consistently held that an unconsenting State "is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."  *Id.* (citation omitted). *See also Frew v. Hawkins,* 540 U.S. 431, 437 (2004) (the Eleventh Amendment confirms the sovereign status of States by shielding them from suits by individuals, absent their consent);   *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670 (1999) (acknowledging that individuals are permitted to sue a State if the State consents, or Congress abrogates the State's sovereign immunity pursuant to the Fourteenth Amendment).

When a plaintiff files suit against state officials in their official capacities, the lawsuit is effectively one against the State.  *Hafer v. Melo,* 502 U.S. 21, 25 (1991). Indeed, a claim for monetary damages against a state official in his or her official capacity is "no different from a suit against the state itself," and consequently, is barred

by the Eleventh Amendment.[6]  *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71

(1989).  *See also McKinley v. Abbott,* 643 F.3d 403, 406 (5th Cir.), *cert. denied*, 132 S.

Ct. 825 (2011) ("Eleventh Amendment immunity extends to state officials who are sued

in their official capacities because such a suit is actually one against the state itself.").

Indeed, the Fifth Circuit has repeatedly held that the Eleventh Amendment bars claims

for money damages against TDCJ officers in their official capacities.  *See e.g., Oliver v.

Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

To the extent Plaintiff is suing any individual Defendant in his or her official

capacity for money damages, those claims are barred by the Eleventh Amendment.  *See

Frew,* 540 U.S. at 437.  Accordingly, Plaintiff's claims for money damages against

Defendants in their official capacities are dismissed with prejudice.

### B.    Eighth Amendment claims.

Plaintiff is suing all defendants under the Eighth Amendment alleging deliberate

indifference to his health and safety and/or deliberate indifference to his serious medical

needs.  Deliberate indifference encompasses more than mere negligence on the part of

prison officials.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  It requires that prison

officials be both aware of specific facts from which the inference could be drawn that a

---

[6] The Eleventh Amendment does not bar a plaintiff's claim for prospective injunctive relief.  *Ex parte Young*, 209 U.S. 123, 159 (1908) (establishing exception to Eleventh Amendment immunity in cases where the alleged constitutional violation is caused by a state official's actions or refusal to act within the authority of his or her office).  *See also Will,* 491 U.S. at 71, n. 10 (noting that official-capacity actions for prospective relief are not treated as actions against the State).

serious medical need or threat to safety exists and then the prison official, perceiving the risk, must deliberately fail to act. *Farmer*, 511 U.S. at 837.

    **(1)**    **Failure to protect**.

It is well settled that the Eighth Amendment's proscription against cruel and unusual punishment requires prison officials to protect inmates from violent attacks by other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). However, not every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety. *Id.* at 834. In order for prison officials to be held liable under the Eighth Amendment for failure to protect, a prisoner must prove that the official knew of and disregarded an excessive risk to the inmate's safety; was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and also drew the inference; and failed to take reasonable remedial action. *Id.* at 842-45. "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as infliction of punishment." *Id.* at 846.

Moreover, a prison official may avoid failure to protect liability if the facts demonstrate that he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. The mere negligent failure to protect a prisoner from assault does not constitute a constitutional violation unless it becomes pervasive. *Davidson v. Cannon*, 474 U.S. 344, 347-78 (1986); *Oliver v. Collins*, 914 F.2d 56, 60 (5th Cir. 1990). Finally, the Fifth Circuit has noted that "no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate

threatened with physical violence." *Longoria v. Texas*, 473 F.3d 586, 594 (5th Cir. 2006).

Plaintiff claims that he lives in fear and is constantly threatened by other inmates. However, at the *Spears* hearing, Plaintiff admitted that he has ***not*** been assaulted, attacked or otherwise physically injured by another offender since he arrived at the McConnell Unit on January 11, 2012. Indeed, he has been continuously housed in Administrative Segregation, the most restricted, and, arguably, most secure housing area in the prison. Plaintiff would prefer to be housed in protective custody where prisoners requiring extra protection are confined together. However, despite repeated OPIs and UCC hearings, Plaintiff's requests for protective custody have been denied. Yet Plaintiff does not claim, let alone offer any facts to suggest, that Defendants' denial of protective custody equates with a constitutional violation. Plaintiff does not claim that Defendants have ignored his LIDs or failed to investigate his claims. To the contrary, Plaintiff testified that Defendants conducted repeated Offender Protection Investigations, and in some cases, the investigating officer did recommend protective custody. However, it is the Unit Classification Committee that determines an offender's classification and housing based on all of the evidence before it, and in this case, the fact that Plaintiff has not been attacked by another offender is relevant evidence that the various UCCs to address Plaintiff's classification and housing have done an adequate job.

The Supreme Court has long instructed the federal courts to accord to prison administrators "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to

maintain institutional safety." *Bell v. Wolfish,* 441 U.S. 520, 521 (1979).  Moreover,
acknowledging that the day-to-day operation of a corrections facility is best left to the
experience and expertise of prison and jail administrators, the Fifth Circuit has
specifically held that the classification of prisoners is a matter better left to the discretion
of prison officials.  *See Wilkerson v. Stalder*, 329 F.3d 431, 436 (5th Cir. 2003) (decisions
regarding prisoner classification are given the "widest possible deference" and are
generally free from judicial intervention).  The fact that Plaintiff is challenging his
classification under the Eighth Amendment does not affect the Court's deference to
prison authorities, but employs it in the contest of determining  whether or not officials
knew or should have known of a serious risk to an inmate, and then disregarded that risk
in deliberate indifference.

Taking all of Plaintiff's allegations as true, that he is routinely threatened by other
offenders because of his indecency with a child conviction and because of his gender
identity disorder, Defendants' decision to house him in a single-man cell, 23-hours a day,
as a means of protecting him does not in and of itself state an Eighth Amendment
violation.  The Court understands that Plaintiff would ***prefer*** protective custody, but the
Court is not privy to the factors employed by prison officials in determining
Administrative Segregation versus protective custody as to any particular prisoner.[7]

---

[7] Although Plaintiff claims that he is in need of protection, he has, somewhat inadvertently,
admitted to setting fires, hiding weapons (upon the request and threat by other offenders), and
threatening to harm a correctional officer in order to be moved out of general population into
administrative segregation.

Moreover, as to particular claims against the numerous named Defendants, Plaintiff simply fails to allege sufficient facts to state cognizable failure to protect claims. For example, Plaintiff named Warden Monroe and Warden Currie as defendants, but he fails to offer any facts to suggest that either of these individuals were personally involved in his classification or housing, and they cannot be held liable based on their roles as supervisors. *Thompkins,* 828 F.2d at 303-04. Moreover, as supervisors, they are free to delegate matters to other individuals. *See Johnson v. Johnson,* 385 F.3d 503, 526 (5th Cir. 2004) (given the size of the TDCJ, it is not unreasonable for supervisory officials to discharge their duties by referring matters to others).

Similarly, Plaintiff has sued four officials who sat on his UCC panels and denied his request for protective custody: Major James McGee, Major Alsobrook, Major Castro, and Warden Barber. Again, Plaintiff does not claim that these Defendants refused to conduct UCC hearings on his claims, or ignored the OPI investigations, and he admits that he was permitted to appear at the UCC hearing and to state his claims. His only complaint against these Defendants is that they did not agree with him that his life was in danger, and they refused to classify him as he desired. Not only do these allegations fail to state a failure to protect claim, they ignore the additional evidence that each UCC panel had to consider, specifically, Plaintiff's tactics to be moved, including hiding contraband and threatening officers, factors that would weigh against assignment to protective custody.[8]

---

[8] The Court notes, however, that administrative segregation is not the "functional equivalent" of protective custody, but indeed, is used by prison officials as a means of punishment. Plaintiff

Plaintiff's complaints against individual officers are equally unsupportive of a charge of failure to protect.  For example, on one occasion, Plaintiff hid a rope in his cell with the intention that, when the rope was found, he would be charged with a disciplinary case and moved.  He claims that Sergeant Ramirez searched his cell, but did not find the rope, thus thwarting his plan.  The fact that Sergeant Ramirez did not find a secreted rope to unknowingly assist Plaintiff in his attempt to be moved to another cell does not equate with deliberate indifference.

On June 23, 2012, Lieutenant Salinas promised that he would talk to Major Castro about Plaintiff's LID claims, which included an admission that he would harm an officer in order to get moved.  The next day, upon instructions by Major Castro, Lieutenant Salinas gave Plaintiff a disciplinary case for threatening an officer, and Plaintiff was moved to Administrative Segregation, F-pod.  Once in F-pod, Plaintiff wrote a grievance concerning Major Castro, but Sergeant Consuelo Benavidez refused to take the grievance to turn it in.  These allegations do not state a failure to protect claim against Lieutenant Salinas or Sergeant Benavidez.

On August 1, 2012, Plaintiff confided in Lieutenant Bernadette Rodriguez that another inmate had given him a handcuff key to hold during cell searches.  Plaintiff was removed from the area before a cell search was conducted, but Lieutenant Rodriguez was ordered to write Plaintiff a major disciplinary case for attempted escape.  These allegations do not state a failure to protect claim against Lieutenant Rodriguez.

---

does not complain that his assignment to Ad. Seg. constitutes punishment in violation of his due process rights, and the Court makes no decision on the validity of such a claim.

On November 18, 2013, Plaintiff advised Lieutenant James Shiver and Sergeant Brandon Belote that Offender Ivy had a homemade spear in his possession, but they failed to take any affirmative action, and on November 20, 2013, Offender Ivy shot another offender with the spear.  However, Plaintiff admitted that he had no way of knowing whether or not these officers reported the information to officials, searched Offender Ivy's cell, or otherwise attempted to investigate the matter.  Moreover, the fact that Offender Ivy attacked another offender is not evidence that these Defendants failed to protect Plaintiff.

On November 21, 2013, Offender Ivy twice shot a spear at Plaintiff, the second time just missing Plaintiff's face.  As part of the Offender Protection Investigation, Lieutenant Boyer reviewed the security tapes; however, he did not observe any spears being shot at Plaintiff on the video.  The fact that Lieutenant Boyer concluded that the attacks were not visible on the security tapes does not state a claim for failure to protect.

### (2)    Deliberate indifference to serious medical needs.

Plaintiff has sued Dr. Ferrell, Captain Salazar, Practice Manager Stalinsky, Warden Barber, Warden Monroe, Warden Currie, and Major Castro alleging deliberate indifference to his serious medical needs regarding his dental issues and the failure of these defendants to provide him a soft diet.  He has sued PA Echavary for refusing to address his skin complaints and questions about his Klinefelter Syndrome diagnosis at the December 4, 2013 appointment.

To state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege the official(s) acted with deliberate indifference to serious medical needs. *Estelle*

*v. Gamble*, 429 U.S. 97, 105 (1976); *Wilson v. Seiter*, 501 U.S. 294, 303(1991); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).   In the context of medical treatment, the prisoner must show "that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks and citation omitted).   However, "unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with [his] medical treatment, absent exceptional circumstances." *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012).

Negligent medical care does not constitute a valid § 1983 claim.   *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).   *See also Graves v. Hampton*, 1 F.3d 315, 319 (5th Cir. 1993) ("[i]t is well established that negligent or erroneous medical treatment or judgment does not provide a basis for a § 1983 claim").   As long as prison medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights.   *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982). Finally, active treatment of a prisoner's serious medical condition does not constitute deliberate indifference, even if treatment is negligently administered.   *See Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999); *Mendoza*, 989 F.2d at 195; *Varnado*, 920 F.2d at 321.   "Deliberate indifference is an "extremely high standard to meet."   *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

**(a)     Defendants Currie, Barber, Monroe, and Castro.**

Plaintiff claims that he sued the wardens and Major Castro because they are in charge of the McConnell Unit and are ultimately responsible for what happens there, including Plaintiff receiving proper medical attention.  To the contrary however, TDCJ-CID security officials have no authority over the medical treatment an inmate is to receive: those decisions are made by medical providers employed by the University of Texas Medical Branch, Correctional Managed Care.  Plaintiff fails to state a cognizable claim of deliberate indifference to his serious medical needs against these individuals.

**(b)     Dr. Ferrell, Captain Salazar, and Practice Manager Stalinsky.**

For purposes of section 1915A, Plaintiff has offered sufficient facts as to defendant Captain Salazar and Practice Manager Stalinsky to state a claim of deliberate indifference to serious medical needs, but not as to Dr. Ferrell.  Dr. Ferrell attempted to get Plaintiff dentures, but prison officials in Huntsville refused.  In turn, Dr. Ferrell recommended that Plaintiff receive a blended diet, and he arranged for Plaintiff to be seen by Dr. Whitt, the medical provider who had the authority to order the diet, and she did so.  Dr. Ferrell's refusal to extract Plaintiff's teeth amounts to no more than Plaintiff disagreeing with Dr. Ferrell's course of treatment, and is not actionable.  Further, to the extent Dr. Ferrell did not want to treat Plaintiff after being named as a defendant in Case No. 2:13-cv-100, Plaintiff cannot attribute an injury to Dr. Ferrell because Plaintiff was able to see the dental assistant.  Dr. Ferrell did not disregard a serious medical need.

Captain Salazar is in charge of the McConnell Unit kitchen.  He is responsible for providing the standard food tray to the majority of the inmates, but also in meeting the

special dietary needs of inmates with diabetes, wired jaws, and other medical issues. Plaintiff states that Dr. Whitt ordered the mechanical soft diet, but Captain Salazar ignored or refused to follow that order as to Plaintiff, causing him pain at every meal. These facts are sufficient for purposes of § 1915A to state a deliberate indifference claim against Captain Salazar.

Plaintiff claims that Mr. Stalinsky denied Plaintiff's request for dentures on the grounds that Plaintiff had failed to show for 17 dental appointments. A prisoner has no constitutional right to have his grievances investigated or resolved in his favor. *Geiger v. Jowers,* 404 F.3d 371, 373-74 (5th Cir. 2005). However, Plaintiff testified that it is Mr. Stalinsky's job to ensure that inmates get to their appointments and receive appropriate treatment. Indeed, with this job description, it appears as if Mr. Stalinsky would be the party responsible for ensuring that Plaintiff receive a mechanical soft diet, as ordered by Dr. Whitt. These facts are sufficient for purposes of § 1915A to state a deliberate indifference claim against Practice Manager Stalinsky.

**(c)    PA Echavary.**

Plaintiff testified that in October 2013, he was seen by doctors at Hospital Galveston for problems with his back, and he arrived back at the McConnell Unit on October 29, 2013. Plaintiff claims that he should have been seen immediately for his follow-up care, but was not seen until December 4, 2013. At the December 4, 2013 appointment, PA Echavary told Plaintiff that he could not prescribe him any additional muscle relaxants, but did prescribe Ibuprofen. PA Echavary also looked at Plaintiff's foot which had evidently become infected while Plaintiff was in transit back to the

McConnell Unit.   In fact, according to his own grievance, Plaintiff had been seen by medical staff at the Darrington Unit on October 28, 2013 for complaints about his foot and prescribed an antibiotic.   (D.E. 10, p. 13-14).   PA Echavary also checked Plaintiff's ears because he complained of recurring earaches.   *Id.*

To the extent Plaintiff complains about the delay in being seen after his return to the McConnell Unit, he fails to allege any personal involvement by PA Echavary.   He does not allege that this defendant was in charge of scheduling appointments or responding to SCRs, and indeed, Plaintiff admitted that the PA does not perform those duties.   Plaintiff also complains that PA Echavary refused to address all of his medical complaints because, in addition to his back, foot and ears, Plaintiff wanted to discuss his Klinefelter syndrome and also his chapped skin.

PA Echavary's refusal to examine and/or discuss Plaintiff's recent diagnosis of a genetic disorder and complaints of chapped skin does not demonstrate deliberate indifference to a serious medical need.   To the contrary, millions of people suffer from chapped skin in the colder months, and Plaintiff does not suggest that he suffered any lasting harm or even pain from this common condition.   As to the Klinefelter syndrome, Plaintiff admits that his mental health care providers arranged for him to be evaluated for this condition at the Jester IV Unit.   The fact that Plaintiff recently became aware of the name of the disorder does not render it serious; indeed, he has had the disorder since birth.   Moreover, even if PA Echavary had discussed the condition with Plaintiff, he would not have been able to "treat" the syndrome at that time as he is not an

endocrinologist or specialist.  Plaintiff's allegations against PA Echavary fail to state a valid constitutional violation.

### C.    Plaintiff's motion for a preliminary injunction.

On February 13, 2014, Plaintiff filed a pleading "to inform the Court" about the difficulties he is encountering getting answers to his medical questions.  (D.E. 20).  He complains about the recent visit to the Jester IV Unit, that he contracted a "cough" in transit, and that he has an ingrown toenail.  These concerns, while important to Plaintiff, do not implicate the U.S. Constitution in any form or fashion.  To the extent this motion was docketed as a request for preliminary relief, it was done so incorrectly, and the Court need not perform the analysis weighing potential harm to Plaintiff, Defendants, or the public.  *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*; 335 F.3d 357, 363 (5th Cir.2003) (party seeking TRO/preliminary injunction must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat that irreparable harm exists; (3) the threatened injury to the movant outweighs the threatened harm to the defendants; and (4) the granting of the preliminary injunction will not disserve the public interest).  Any pending motions are hereby **DENIED**, and Plaintiff is instructed to not file any additional pleadings until after Captain Salazar and Manager Stalinsky have been served and filed their Answers.

## V.    Conclusion.

For the reasons stated herein, the Court orders that:

(1)    Plaintiff's Eighth Amendment claims alleging deliberate indifference to his serious medical needs against Captain Juan Salazar and Medical Practice Manager Drew

Stalinsky in their individual capacities are **RETAINED**, and service shall be ordered on these individuals;

(2)     Plaintiff's claims for monetary damages against all Defendants in their official capacities are **DISMISSED** as barred by the Eleventh Amendment;

(3)     Plaintiff's claims against Sue Alexander and James Hultzclaw are **DISMISSED**  without prejudice on Plaintiff's oral motion;

(4)     Plaintiff's remaining claims against the remaining Defendants in their individual capacities are **DISMISSED** with prejudice for failure to state a claim and/or as frivolous;

(5)     Plaintiff's motion for a preliminary injunction (D.E. 20), is **DENIED**;

(6)     Plaintiff's motions for transfer to a different facility (D.E. 9 and 10) are **DENIED**; and

(7)     Plaintiff is instructed to refrain from filing any additional pleadings or correspondence with the Court until after the retained defendants have been served and filed their Answers.

ORDERED this 28th day of February, 2014.

Jason B. Libby
United States Magistrate Judge